## BURCH, *et al. vs.* SCOTT.—*December*, 1829.

A bill was filed in June, 1823, and the usual process of *subpœna* and attachment issued, which were served on the defendant, from term to term, until March, 1824. He failing to appear, the Chancellor passed an order to take the bill *pro confesso,* which was also served on the defendant the 1st of May following. The cause was then proceeded in to final decree in August, 1825, and a *fieri facias* issued, returnable to December term, 1825, at which term the original defendant with others alleged to be interested in the decree, filed a bill to have the execution countermanded, the decree opened, and an answer of the defendant to the first bill accepted. The grounds of this application were, that the claim was unfounded, that proper parties were not originally made, and that the defendant had been prevented by the omissions of his counsel prior to June, 1824, and by accident in the transmission of his answer since that time, from putting in his answer as he designed and intended. Upon this the Chancellor countermanded the execution, and after answers were filed controverting this application, rescinded the decree of August, 1825, and all proceedings subsequent to July, 1824. *Upon appeal it was held,* not to be consistent with the salutary exercise of that sound discretion which the Court of Chancery possesses, to open or discharge the enrollment, and vacate the decree in this case, for the purpose of enabling the defendant to make his defence.

A decree of the Court of Chancery is to be considered and taken as enrolled, when it is signed by the Chancellor, and filed by the register, and the term has elapsed during which it was made.

APPEAL from the Court of Chancery. On the 14th of June, 1823, the appellants filed their bill against the appellee, upon which an *injunction* and *subpœna* issued, and were served to September term, 1823, when the defendant not appearing, an attachment issued against him, and he was returned attached to December term, 1823. The attachment was renewed, and the defendant was returned attached to March term, 1824. On the 30th of March, 1824, an order was passed to take the bill *pro confesso, &c.* A service of this order on the defendant, was proved on the 1st of May, 1824. At March term, 1825, commissions issued to take testimony, which were returned to July term, 1825. On the 4th of August, 1825, the case was referred to the auditor, who on the same day made his report, when the Chancellor decreed accordingly. On the 25th of September, the complainants petitioned for a writ of *fieri facias,* to levy the

amount of the sum of money decreed to be paid to them by the defendant, which was, thereupon ordered, and issued returnable to September term, 1825. It was renewed to December term, 1825. Afterwards, and at the same term (December 1825,) the defendant, with *Berry, Gittings* and others, filed in the said cause a bill, (stated in the record to be a bill of review,) reciting the substance of the bill of the complainants of the 14th of July, 1823, and the proceedings thereon, and certain proceedings in the Orphan's Court in the *District of Columbia*, and in *Montgomery* County, and in the Court of Appeals, between the intestate of the complainants and the intestate of the defendant in their respective lives, and between the intestate of the complainants and the defendant (see 6 *Harr. & Johns.* 67,) and certain proceedings of the defendant as administrator of *K. Gittings*, his intestate, in the course of which proceedings, the defendant, after being served with the injunction and *subpœna* in this case, (which was before September, 1823,) "lost no time to apply to his counsel, *W. Jones*, Esquire, to draw his answer, and pursue the necessary steps to determine the controversy speedily and finally ; but that owing to the residence of the counsel out of the State, his not being a regular practitioner of the court, and his various professional avocations, the said *Scott* was frequently and contrary to his anticipations and expectations, disappointed in having the business put in train for a decision. That he at length became so anxious and uneasy on the subject, that hearing of his said counsel being in attendance at the Court of Appeals in *Annapolis*, at the June term, 1824, he came from his home in *Montgomery* County to *Annapolis*, for the express purpose of having an interview with him, and getting the answer drawn and filed. That he found his counsel on the eve of returning to *Washington*, whither he accompanied him, and immediately on their arrival, the answer was drawn and regularly sworn to, and put into the hands of his counsel to be transmitted by the stage next morning to the register of the court. That said *Scott* had frequently interviews afterwards with his counsel on the subject, and he, as well as his counsel, took it for granted the answer and exhibit

had been duly received; and he was informed by his counsel, that he had made an arrangement with *Mr. Key*, one of the opposite counsel, who resided in *Georgetown*, to fix upon some day convenient for them both to go to *Annapolis*, and argue the cause. And that said *Scott* remained under this impression without the slightest intimation of the answer's having miscarried, until he found that there had been a decree against him, followed by execution. And when he communicated to his counsel the facts of his property having been seized by the sheriff, he was utterly at a loss to comprehend how it could have been brought about; *having only heard a short time before of the miscarriage of the answer*, and not dreaming that there could have been a decree, till writing to the register of the court for information, he was certified of the fact." These complainants then by their bill complain, that the decree had been obtained by surprise and fraud on the part of the complainants therein, (the appellants) and contrary to their own knowledge of right and conscience; that the complainants, the *Gittings's*, are the children and distributees of *Kinsey Gittings*, on whose estate the complainant *Scott* administered; that *Scott* is only a trustee, and they the parties really interested, and ought to have been made parties by the appellants in their bill; that the decree is altogether fraudulent both against *Scott* and the *Gittings's;* inasmuch as by fraud and concealment, the appellants obtained a decree for more than was due, (if ever any thing was due,) having concealed sett off's and deductions which they had always admitted; and as against *Scott*, by like fraud and concealment, have charged him with a sum exceeding what he had received and was accountable for. That *Scott's* said answer, which by some unforeseen and inevitable accident had miscarried as aforesaid, presented a just and substantial defence, and that the miscarriage and loss of said answer has been discovered and known to *Scott* since the said decree, and not before, and the other complainants were totally ignorant that *Scott* had failed to put in his answer. The bill then objects to the order and proceedings of the Chancellor, and the returns and proceedings of the commissioners, and states

certain errors therein for which *Scott* has brought this his bill, in the nature of a bill of review, to review, revise, &c. and prays for himself and the other complainants, that the said decree and proceedings may be reviewed and reversed, and that the appellants may answer the premises; and that *Scott* may be allowed to put in his original answer, plea, &c. to said original bill, and the other complainants allowed as well as *Scott* to appear to the said bill, and answer and defend the same upon the original merits, unprejudiced by said decree; that the said cause may be heard upon all and singular the allegations, matters and things, in this their supplemental bill in the nature of a bill of review alleged and maintained, at the same time that it is reheard upon the said original bill; that the complainants may be restored to their original situation before the decree; that the said decree may be opened for such rehearing; that the execution thereof may be suspended, and the writ of *fieri facias* countermanded; and praying publication against the defendants therein, &c. Accompanying this bill was an affidavit from the counsel, *Mr. Jones,* stating the drawing of the answer in *Washington* with a plea in the bar and a demurrer to the equity of the original bill which was sworn to and returned to him to be transmitted to the register in Chancery; that finding the package so large as to make the transmission of it by the mail very expensive, he sent his servant to the stage office to inquire whether there were any passengers for *Annapolis* in the stage of the next day, who returned with answer that he had found a gentleman who would take charge of the package; upon which he delivered it to his servant, very securely sealed up and directed to the register of the Court of Chancery in *Annapolis,* with a note requesting him to file the answer, and enter a notice to dissolve the injunction. He does not recollect that the servant named the person to whom he delivered the package; upon questioning him lately, he thinks he did not know his name, and has forgotten it if he did. That he had frequent conversations afterwards with Mr. *Key* about appointing a day to go to *Annapolis* and argue the cause, after he had informed him that he had put in the answer. He *rested* without the least doubt or apprehension of

the answer's being regularly filed, and does not remember when he experienced so great surprise as when he heard of the bill and decree.

Upon this bill and affidavit, the Chancellor by his order of the 16th of November, 1825, suspended and countermanded the execution, and all further proceedings under the decree. At December term, 1825, *Scott* filed an answer to the appellants original bill against him, with sundry exhibits of certain proceedings of the former controversy, in the life of *K. Gittings,* in the Orphan's Court of the *District of Columbia,* which it is unnecessary to state. Afterwards, at the next term (March, 1826) the appellants appeared and filed their answers with sundry exhibits, to the bill of *Scott, Berry, Gittings* and others, in which they aver and state the justice of the original claim, for which the decree had been obtained; the proceedings in the former suit, &c. the justness and fairness of the decree, denying the allegations of the bill, and refering to the proof taken of *Scott's* own acknowledgments of the justice of the claim and that he held the money to be paid, whenever the cause should be determined, to the appellants. The answers state the allowance of certain credits, and that they were endorsed on the *fieri facias,* and deny the justice of the others claimed by *Scott.* That the order for taking the bill, *pro confesso,* was served on *Scott* before the 20th of June, 1824. They admit that their counsel was informed, that *Scott's* answer was filed; and that they are informed and believe, their said counsel thereupon wrote to *Annapolis* for a copy of it, and was informed that none was filed, which information he shortly afterwards communicated to *Mr. Jones.* They charge, that the same fact was again, afterwards, communicated to *Mr. Jones,* after a considerable interval, and they believe was also communicated to *Scott.* They expressly charge, and state they are prepared to prove that *Scott* had such information before the decree. They deny all fraud in obtaining the decree, and deny that there ought to have been any surprize on the part of *Scott,* who is charged as desirous to delay his answer, as long as he safely could.

Afterwards, at the same term, (March, 1826,) the appellants filed their petition, praying the Chancellor to revoke his order of suspension of the 16th of November, 1825. And on a rule to show cause on the 25th of July, 1826, the Chancellor passed the following order.

BLAND, Chancellor, (July term, 1826.) This case standing ready for hearing on the notice given in pursuance of the order of the 4th of May last, to show cause why the order of the 16th of November last, should not be dissolved and revoked, the counsel of both parties were heard and the proceedings read and considered.

The Chancellor feels every disposition to relieve this case from all embarrassing forms, and to reach its merits if practicable. It will, therefore, be necessary to disengage the complainants substantial equity and object, from the forms with which they have been clothed; and to examine their bill with a due regard to their equity and object. The substance of their complaint is, that a decree has been obtained against some, which materially affects all of them, erroneously—by fraud—by surprise; or, to say the least, improperly and to the exclusion of a good and available defence. And upon the truth of these allegations they ground their equity to have the decree of the 4th of August last set aside—their defence let in, and the matters in controversy heard upon the merits. This is the object, and the mode chosen by them to attain it is, by what they call "a supplemental bill in the nature of a bill of review." Whatever may be the cause of complaint, the party asking relief must conform, at least in substance, to prescribed rules as to time and manner.

It has been the long established usage and law of the Court of Chancery to consider all its orders, and decrees, as completely within its control, and open to be altered, revised or revoked, during the whole term at which they are passed, on motion or by petition. But, if the term is suffered to elapse, the party can only obtain relief by bill of review. This law of this court is analogous to that which has been adopted by the courts of common law; and which has been found alike salutary in both. It is believed there is no decision of the Court of Appeals which

has directly or distinctly restricted or altered this rule of the Court of Chancery. But in this case the bill of these plaintiffs was not filed until long after the close of the term at which the decree was signed. It cannot, therefore, be considered as entitled to the same indulgence, or as standing altogether on the footing of a petition for a rehearing, or alteration, or opening of a decree, filed during the term at which the decree was signed.

This bill charges, that the decree of the 4th of August last was obtained by fraud. It is the peculiar province of this court to grant relief in all cases against fraud and accident, not within reach of the courts of common law. And there can be no case, of that description, in which it would be more fit and proper for it to interfere than upon a charge, that its own decree had been obtained by fraud. Such a case is, however, brought before the court, not by a bill of *review*, but by an *original* bill. And in that light, the allegations of this bill require the court, in some respects, to consider it.

In the Court of Chancery of *England*, the Chancellor, it seems, after the hearing, pronounces the substance of his decree orally, minutes of which are taken down by the register, who afterwards draws them out into the form of a decretal order; and, if in doing so, any mistake should occur, the execution of the order may be stayed a while; until it can be corrected by motion in court. As thus drawn up, this judgment of the court is always called its "decretal order." But it has the force only of an interlocutory order; and is not a perfect, complete, and final decree before enrollment; for till then the Chancellor may rehear, alter, or reverse it. The proper officer draws up the form of the decree of enrollment, from the decretal order, reciting all the pleadings, &c. after which a fair copy is made upon parchment and signed by the Chancellor. It is then, and not until then, an enrolled and final decree. The interval of time suffered to elapse between the making of the decretal order, and the enrollment, is seldom less than a month, often more, and in some cases exceeds a whole year. But in this interval the decretal order is so far considered as a final decree that it may be enforced by attachment.

The Court of Appeals of this State have declared, that the decree of the Chancellor is subject to his control, only upon a bill of review, or a bill in the nature of a bill of review. A bill of review lies after the decree is signed and enrolled. A bill in the nature of a bill of review lies after the decree is made, but before enrollment. *A decree must be considered as enrolled, after it is signed by the Chancellor and filed by the register.* But the Chancellor rarely, if ever, pronounces his decree orally, as in *England,* or if he does do so in any case, no minutes of it are taken down. He is considered as having pronounced no judgment; nor as having made any decision in the cause until a decree is drawn up in writing, in full and proper form and signed by him. That decretal order, which, in *England,* always precedes the enrolled or final decree is never made here, and is unknown to our practice. But in *England* the phrase "decretal order," is often applied to various other orders beside that which immediately precedes the decree; and it is sometimes applied in the same sense here.

The plaintiffs have stiled this bill, "their supplemental bill in the nature of a bill of review." But, one of them was the *defendant,* and the others were no parties to the original bill; and it is attached, as an addition, to no other bill; nor does it purport to supply the defects of any original bill. It is, therefore, in no sense a *supplemental bill.*

In *England,* a bill of review can only come in after the decree has been perfected and enrolled. But if the party discover any error, or new matter of fact after the decree has been pronounced, and before it has been enrolled, he may obtain relief by *a bill in the nature of a bill of review;* and need not wait or go to the expense of having the decree enrolled. Now, from what the Court of Appeals have said, as we have seen, it clearly follows, that in this State, there can be no such thing as *a bill in the nature of a bill of review:* Since all decrees here are made by being signed and filed; and when so made are to be considered as decrees enrolled. Most clearly such a bill cannot be resorted to in this case.

A bill of review, properly so called, lies *against* those who were parties to the original bill, and *against them only;* and must be either for error apparent on the face of the decree, or for some new matter. But, before a bill of review for newly discovered matter can be filed, the party must petition for leave to do so: setting forth the new matter, strongly sustaining his statement by affidavits; upon which the leave of the court is granted. In this case there has been no petition setting forth newly discovered matter, nor any leave given to file such a bill. This bill, therefore, can, in no respect whatever, be considered as a bill of review grounded on the discovery of new matter.

A bill of review for error apparent on the face of the decree may be filed without asking or obtaining the leave of the court; and it may be brought *by* either of the parties to the original bill alone; or it may be filed *by* a person not a party to the original decree, but whose rights are injured by it. Such is the case now before this court. The bill of these plaintiffs has this character, and more.

This bill has yet another aspect. It alleges, that the plaintiffs, one of whom was a party to the original suit, had a good and available defence; that all of them should have been made parties; that they have, all of them, an interest which they will be able to maintain and prove; and that the decree of the 4th of August last was obtained by surprise, or owing to a kind of negligence for which they are not at all blamable, or for which they may, at least, be excused. Upon these grounds they pray to have the decree opened and the cause reheard. According to the *English* authorities, if the enrollment of a decree be obtained by surprise or irregularity, it may be opened; provided, the application be made within reasonable time. And where the merits of the case had not been entered into, an enrolled decree has been set aside, upon the special circumstances, notwithstanding the proceedings were strictly regular. For a court of justice will make every effort, when in its power, to reach the merits of the case, and have justice done.

This bill, then, divested of all extraneous matter may be regarded in three distinct characters. *First,* as an original bill to

have the decree of the 4th of August last reversed on the ground of fraud. *Secondly*, as a bill of review for error apparent on the face of the decree, and because it injuriously affects the interests of some of the complainants who were not parties to it; and *Thirdly*, as a bill, grounded on the peculiar circumstances, asking to have the decree by default set aside, and the case reheard upon the merits.

It was in these characters, that it presented itself to the mind of the Chancellor when it was first laid before him. He then felt, as he still does, a strong impression, that these characters were so entirely incompatible, as to be incapable of being blended together in the same bill; but he conceived, that if it could be sustained in all, or any of them, the parties complaining would be entitled to relief. And under this impression it seemed to him fit and proper to suspend, at least for a season, the execution of the decree, until those matters could be more carefully canvassed, and both parties could be heard. And therefore it was, that he passed the order of the 16th of November last; which operated as an injunction, and was intended so to operate.

But, in the course of the argument, the one party seemed to construe this order as a total revocation of the decree of the 4th of August last; and the other, as a mere stay of execution, because of some credits not having been given. It was also urged, that the allowing of such a bill of review to be filed, did of itself operate as a suspension of all further proceedings, until the final hearing; and that it must be so understood, when taken in connexion with the prayer of the bill, and the circumstance of a bond having been required and accepted. The Chancellor has been misunderstood.

According to the *English* law, neither the filing of a petition for rehearing; nor a bill in the nature of a bill of review, nor a bill of review for error apparent on the face of the decree; nor a bill of review for new matter after leave given; nor an original bill to set aside a decree on the ground of fraud; nor a bill to open an enrolled decree and let in the merits, has ever or under any circumstances been considered, *in itself*, as a sus-

pension of the execution of a decree. The party having the decree, in all such cases, is allowed to proceed, unless specially and expressly restrained; which is never done but on the sum decreed being brought into court, or on good security being given. Similar law and practice has been long established here ; and, hence it was, that the Chancellor required a bond with approved security to be filed, before he imposed the restriction or injunction, expressed in the order of the 16th of November last.

If, on considering this bill in its *third* character, there should be found sufficient cause for opening the decree, and having the case reheard upon its merits, it will be most advantageous to all parties, that it should be done: and it will be unnecessary to inquire, and express an opinion, whether the three characters of this bill are not incompatible ; particularly as no objection to it has been made on that ground ; or whether the decree has been obtained by fraud or not; or is erroneous upon its face. The decree of the 4th of August last, now complained of, was obtained in that suit by the default of the defendant in not filing his answer within the time prescribed by the rules of the court. This apparent negligence, the present plaintiffs, by their bill, have endeavoured to account for—to justify, or to excuse. And whether they have done so or not, is the matter now to be ascertained ; if they have, this decree must be opened.

The decree was signed as of July term; and, as has been observed before, all decrees and orders of the court being held entirely subject to its control during the term, if an answer had come in at any time, previous to the close of that term, the decree by default would have been set aside, and the defence let in. No decree by default, under the rule, will be signed until after the first four days of the term ; but after that an answer may be filed, and the decree rescinded, at any time during the term. On turning to the proceedings in the original case, it appears, that there had been a return against *Scott*, the defendant, attached for not appearing ; in consequence of which, on the 30th of March, 1824, the usual order *nisi* was passed, requiring him to appear and answer by the 4th day of the next July term, which commenced on the 13th, and

closed on the 24th of the same month.    Therefore, at any time after the 17th of July, 1824, the parties might have obtained the decree which was signed on the 4th of August, 1825.

That they did not obtain it sooner can only be imputed to their own misunderstanding, negligence, or indulgence; because, the court, on application, would have inspected the proceedings, and have done on the next day, after that day, precisely that which it did, when called upon one year after.    The plaintiffs in that case then, owing to their own negligence or indulgence, stood in no better situation at the July term, 1825, than they did at the July term, 1824; because, their decree by default, according to the established practice, was liable to be corrected or revoked during the term at which it was signed.    The July term, 1825, commenced on the 12th of that month, and was not finally closed until the 17th of August following.    Consequently, the decree was not final and absolute until that day.    After which it could only be opened or affected by an original bill, or a bill of review.    The bill to set aside this decree was not filed until the 15th of November, 1825; and *Scott*, one of the plaintiffs here, was not charged, on the record of the original case, with a default, which might have been fixed upon him by a decree, until the 18th of July, 1824, making a space of about fifteen months of apparent negligence, which is to be accounted for, justified, or excused.    To find which, we must examine the bill and answer in this case.

That the defendant *Scott*, in the month of July, 1824, and before he could have been finally fixed with a decree by default, had made an answer, which was ready to be put on file; that he had charged his solicitor with the care of it; who had attempted to forward it to the register, to be put on file, are facts proven and not denied.    It also appears, that under a firm belief, that his answer had reached its destination, and was on file, his solicitor proposed to the solicitor of the plaintiffs to agree upon some day when the cause should be argued by them.    The defendant, in this case, *Thomas Burch*, in his answer, states, that thereupon his counsel wrote for a copy of *Scott's* answer, and was informed, that it had not been filed; which information was

shortly afterwards communicated to *Scott's* counsel, which after a considerable interval was again mentioned to him. And it is expressly charged, that *Scott himself*, knew the fact before the decree was signed. That *Scott's* solicitor was very negligent is most manifest. But it does not clearly appear, that *Scott himself*, is chargeable with negligence to a greater extent than about four or five months; for it is not said by *Burch* in his answer, how long it was, before the date of the decree, that *Scott* was informed his answer had not been filed; but it would seem, that the counsel of the plaintiffs in that case, to be assured of the fact whether *Scott's* answer was filed or not, inquired for it, and searched the papers so late as about the 1st of July, 1825.

It is admitted by the defendants in this case, that the decree of the 4th of August last is for a greater amount than it ought to have been given for; in this respect, therefore, it confessedly requires revision and correction. It is a decree by default, and not upon the merits. But *Scott* avers upon oath, that he has a good defence against the whole claim of the defendants, which he prays to have let in. And it is not alleged by his opponents, that they have lost, or been deprived of any means of sustaining their pretensions. In short, under all the peculiar circumstances of this case, it appears to be fit and proper, that the decree of the 4th of August last should be revoked; but it must be upon the terms of paying all costs.—*Decreed*, that the decree of this court passed and signed on the 4th of August, 1825, in the case wherein *Thomas Burch*, administrator *de bonis non* of *Jesse Burch*, *Fielder Burch* and others are plaintiffs, against *William Scott*, together with all the proceedings in the said suit subsequent to the fourth day of July term, 1824, be revoked, rescinded, and annulled.—*Decreed* also, that the said *Scott* forthwith pay unto the said complainants all the costs which they may have incurred in the prosecution of the said suit subsequent to the fourth day of July term, 1824, to be taxed by the register—*Decreed* also, that the answer of the said *Scott*, purporting to have been received and filed on the 7th of December, 1825, in the said case, be allowed to be filed as his answer in the said suit, subject to all legal exceptions thereto.

From this decree, the complainants in the original case, appealed to this court.

The cause was argued before BUCHANAN, Ch. J. and EARLE, MARTIN, STEPHEN and ARCHER, J.

*F. S. Key* for the appellants. The Chancellor has considered the bill of the appellee as having three aspects, under all, or some of which he is entitled to the relief prayed. "*First*—as an original bill to have the decree of the 4th of August, 1825, reversed on the ground of fraud. *Secondly*—as a bill of review for error apparent on the face of the decree; and because it injuriously affected the interests of some of the complainants who were not parties to it; and *Thirdly*—as a bill grounded on the peculiar circumstances, to have the decree by default set aside, and the case reheard upon its merits." It is chiefly upon this latter ground that the Chancellor seems to grant the relief.

On the part of the appellants he contended, that considering the bill in all or either of these aspects, this decree is erroneous. *First*, "as an original bill."—1. The bill itself presents no case for relief; and, 2. If it did, the answer denies every thing that would make it a case for such relief. The answer denies all fraud or surprise, and charges that both *Scott* and his solicitor were informed of the answer's not being on file, some time before the final decree. It also denies the averment of merits as to the original controversy, and exhibits (which is conclusive of that subject) a copy of the decree in the case of *Burch* against *Gittings* in the Orphan's Court of the County of *Washington*, in the District of *Columbia*, which was never appealed from, and settled the question of right as to the negroes, which *Scott* afterwards sold as *Gittings'* administrator—the price of which, it was the object of the appellants' original bill to recover from *Scott*. The deposition of *Brightwell* also shows *Scott's* own acknowledgment that he had no merits. Considering the bill in this aspect, the Chancellor's decree is on bill and answer, and the answer was to be taken as true.

*Secondly*, "as a bill of review for error apparent on the face of the decree; and because it affected the interest of some of the

complainants who were not parties to it." There is no error on the face of the decree, and none such is pointed out in the bill; also its affecting the interest of some of the complainants who were not parties to it, could not entitle *Scott*, and much less the others who were not parties, to file a bill of review.

*Thirdly*, "as a bill grounded on peculiar circumstances," &c. There can be no such bill; the decree of the 4th of August, 1828, was only subject to the Chancellor's control, by rehearing, during the term at which it was signed, by a bill in the nature of a bill of review; and after the term, only by a bill of review.

In his argument he cited *Cooper's Plead.* 95, 97, 98. *Hollingsworth vs. M'Donald*, 2 *Harr. and Johns.* 237. The *act of Assembly*, 1820, *ch.* 161. *sec.* 1, 2, 3. *Marine Insurance Company*, 17 *Hodgson*, 7 *Cranch*, 336. *Henck vs. Todhunter, et al.* 7 *Harr. and Johns.* 278. *Munnikuyson vs. Dorsett*, 2 *Harr. and Gill*, 374. 2 *Johns. Dig.* 327. *Pinkney vs. Dowson*, 4 *Taunt.* 779. *Avery vs Petten*, 7 *Johns. ch. Rep.* 211. *Cameron vs. M'Roberts*, 3 *Wheat.* 591.

*Jones* for the appellee. The only possible complaint that can be made by the appellants in this case is that of delay; and they have themselves been guilty of great delay. No injury will result, except that of delay until the merits are decided on.

1. As to the nature of the new bill—Whether it is to be considered as a bill of review. Even if the decree upon it has set aside the former degree on a ground which may not be tenable; yet if there were other reasons which might justify the decree, they will prevail. It is not the reasons of the Chancellor which this court are bound by; but if the decree was proper, then it is no consequence what reasons for it are assigned. The bill (called a bill of review) goes upon two grounds—one that the proceedings against the now appellee were irregular, and the other surprize, &c. A party may pray alternative grounds of relief in the same bill. It is matter of little consequence what the bill is called. A supplemental bill, it is admitted, can only be filed by a complainant in the original bill.

2. As to à decree in paper, and a decree enrolled. If the decree is enrolled, it may be reversed by a bill of review, or on an appeal, or for new discovered evidence, or error in law. But where the decree is in paper it may be reviewed, revoked, &c. on petition for a rehearing, or by bill of review, &c. A decree is never enrolled until the suit is finally disposed of. Where it is not enrolled it may be opened on motion. The courts now on all accasions proceed by way of motion—rule to show cause, &c. It is substituted in the place of an *audita querela*, and writ of error *coram nobis*. It has been the practice in our courts to set aside a judgment after the term has elapsed. *Jackson vs. Union Bank of Maryland*, 6 *Harr. & Johns.* 151, 152 (*note*.) *Gover, et al. lessee vs. Cooley*, 1 *Harr. & Gill*, 7. It is not the expiration of the term, but the enrollment of the decree. When is the decree made an unalterable record? So long as the enrollment of the decree is suspended, it may be re-examined. What is the enrollment of a decree? It is a record of the whole proceedings in the case. A judgment enrolled is a record of the whole proceedings, and so also is the enrollment of a decree—not separated from the proceedings. *Newl. Ch. Pr.* 191, *sec.* 3. *Wiser vs. Blackly*, 2 *Johns. Ch. Rep.* 488. If the decree is enrolled at the end of the term, it is equally so the moment it is filed with the register. No other act is to be done at the end of the term than when filing the decree. *Bennet vs. Winter*, 2 *Johns. Ch. Rep.* 205. By the act of 1817, *Ch.* 119, *sec.* 9, no decree, or the proceedings upon which it may be founded, is required to be enrolled or recorded, unless it affects real estate or brings it into question.

3. As to the different natures of bills and petitions for rehearing, &c. *Mitf. Plead.* 34, 84, 85. 2 *Madd. ch.* 464, 465, 537. *Wooster vs. Woodhull*, 1 *Johns. Ch. Rep.* 539. *Cooper's Plead.* 88, 99. *Ridgely vs. Carey*, 4 *Harr. & McHen.* 167. *Griffith vs. Pennington*, in the late Court of Appeals, November, 1795, (*M. S.*)

4. As to the regularity of the proceedings previous to the first decree. He referred to the acts of 1799, *Ch.* 79, and 1820, *Ch.* 161, and stated that the proceedings in the original case were

under the former, instead of the latter act, if indeed they were under either act; that if the proceedings were under the act of 1799, *ch.* 79, there was no authority to issue a commission to one commissioner to take testimony.

*Magruder* in reply. The defendant in the original case, was in contempt for not appearing—no fault was found against him for not doing so, it being optional with him to appear or not; but not appearing, he was attached. Still he did not appear, so that the decree against him was regular with his entire consent. But it has been said, that the proceedings were not warranted by the acts of 1799, *ch.* 79; and 1820, *ch.* 161. This court is not now sitting on an appeal from that irregularity, if any. If the defendant in that case was aggrieved by the decree, he should have appealed from it. This he did not chose to do. The act of 1820, *ch.* 161, was intended to expedite suits in the Court of Chancery, and to prevent delays therein. There can be no bill of review, where the party asking for the review, has never appeared in court. *Cooper's Plead.* 88, 90. Where a bill of review is allowed, the party filing it must have first complied with the decree. *Williams vs. Mellish*, 1 *Vernon*, 117. *Wiser vs. Blackly*, 2 *Johns. ch. Rep.* 491. If the bill is to impeach the decree for fraud, then the regular mode is pointed out in *Cooper's Plead.* 96; but it is not such a decree as is mentioned in *Milf. Plead.* 85. The Chancellor in this case, does not decide that the bill could be filed on the ground of fraud; but, he sets aside the decree, under the peculiar circumstances of the case. *Newl.* 190, sums up all the old cases, and there is no instance of a proceeding like this. The application is always to strike out the enrollment of the decree. *Wiser vs. Blackly*, 2 *Johns. ch. Rep.* 490. *Newl.* 191. The case of *Hollingsworth vs. McDonald*, 2 *Harr. and Johns.* 237, settles the question when a decree is to be considered as enrolled. In this court in *Lyles vs. Lyles*, 6 *Harr. and Johns.* 273, at a subsequent term, a motion was made to amend the judgment of affirmance, by giving additional damages by way of interest, but it was refused. Where the courts will amend or strike out a judgment, under the peculiar circumstances of the case, or the

nature of the action, he referred the court to *Jackson vs. Union Bank of Maryland,* 6 *Harr. and Johns.* 151. (*note*) *Gover, et al. Lessee vs. Cooley,* 1 *Harr. and Gill,* 7.    The *Palmyra,* 12 *Wheat.* 8.    *Hudson vs. Guestier,* 1 *Cranch,* 1.    *Cameron vs. McRoberts,* 3 *Wheat.* 591.    The original decree in this case was upon the merits, and not by default.    The practice of our Court of Chancery is founded principally upon our acts of Assembly, and it is very rarely that the *English* practice is resorted to.    *Hodges vs. Davis,* 4 *Hen. and Munf.* 400.    There can be no relief in equity, where it could have been obtained at law.    *Contee vs. Cooke,* 2 *Harr. and Johns.* 179.    Why should the decree be opened for the want of proper parties?    No person is bound by a decree to which he was not a party.    If the defendants considered that all the proper parties were not before the court, a bill of interpleader should have been filed.    *Mitf. Plead.* 47.    A bill of review may be brought at any time within twenty years after the decree.    An appeal from a decree must be made within nine months ; and if the party is ever so much aggrieved, his right to appeal, after the nine months have elapsed, is gone. · If the present bill of review is sustained, then the party will be permitted to lay by for near twenty years and then file his bill of review, which, as in this case, is no more than an appeal from a decree regularly passed in the case.

*Jones* for the appellee, (with the leave of the court) in answer to some points suggested by the counsel of the appellants in reply, and not adverted to in the opening.    1. It has been objected by the appellants counsel, that before the allowance of this bill as a bill of *review,* or in nature of a bill of *review,* the decree should have been actually *complied* with, by payment of the money decreed, or bringing it into court; or else a compliance excused by swearing to his inability, want of assets, &c.    *Answer,* 1.    This is prescribed by no positive rule of law, but depends upon the *discretion* of the Chancellor, or the *rules of practice* established in the court, at the discretion of the Chancellor. In the *English* Chancery the rules of court, at one time, required a preliminary performance of the decree, even to the payment of money, if the decree were merely pecuniary.    Now

the performance of the decree, if it go to any collateral act, is still required; but if it go merely to the payment of *money*, the practice is to require either *actual payment*, or *security* for the payment, at the discretion of the Chancellor. 2 *Madd. Ch.* 539. (2d *Ed.*) where this alternative of the payment of the money or giving security is expressly stated, and precedent cited. In this case, the Chancellor, in the exercise of a sound discretion, required *security* only for the payment of the money, in case the defendants should be cast at the final hearing on the merits; and *security*, approved by him, has been given. *Answer*, 2. The terms to be imposed upon a party seeking the review, are entirely a matter of discretion with the Chancellor; there is no fixed rule of law. Great latitude is allowed in adapting the terms to the circumstances of each case. Then no interlocutory order of the Chancellor, in the exercise of this discretion, is examinable on appeal, any more than the admission or refusal of a plea; the setting aside or refusing to set aside a judgment by default, &c. All of which are decided by this court to be without its cognizance as an appellate court. *Jackson vs. Union Bank of Maryland*, 6 *Harr. and Johns.* 151 (*note.*) *Gover, et al. Lessee vs. Cooley*, 1 *Harr. and Gill*, 7. *Answer*, 3. A fair exception to the rule is presented in this case. The defendant was charged in the original suit as administrator of *Gittings* for property that came to *his* hands as assets; and as such, regularly inventoried, appraised and disposed of; and he swears that a great part of it is uncollected; and a great part of what he has collected, has been forced out of his hands, both before and since the decree, by the creditors of *Gittings*.

2. It has also been objected by the appellants' counsel, that the errors in the proceedings and decree, upon the original bill, are not cognizable by this court, for want of an appeal directly from that decree, taken by the original defendant. *Answer*— But for errors of law apparent on the face of the proceedings, a bill of review is the appropriate and specific remedy, and such a bill is just as admissible in the Court of Chancery of this State as in any other, and is so recognized in the practice of that court, and by this court in *Hollingsworth vs. McDonald*, 2 *Harr. and*

*Johns.* 237. The limitation, by statute, of the time in which *appeals* may be taken, has nothing to do with bills of review; and can, by no possibility, be construed into an implied abolition of the practice. The two remedies are specifically different in their nature—the one calls for a re-examination of the decree upon all the grounds both of *law* and *fact*,—the other of law only; and the views of policy and convenience that restrict the right of appeal at large, extend not to the modified revision of decrees for manifest errors of law. The appeal from the Chancellor's order setting aside the original decree, necessarily and directly brings before this court the regularity and legality of that decree, and the proceedings that conducted to it; for if there be such manifest errors, the order setting aside the decree (no matter upon what specific and declared reason in the argument of the Chancellor) is completely justified, and must be affirmed.

3. It has also been objected, that it is no question on a bill of review whether the *proof* be sufficient, but whether there be any error of law apparent on the face of the proceeding; or in other words, that a bill of review lies for manifest error of *law*, and not for errors of *fact.* This is admitted without hesitation or qualification. But all our objections to the decree proceed upon manifest errors of *law*, and not of *fact.* All the departures from the provisions and *formula* of the statute by which alone an *exparte* decree, by default, can possibly be justified in this case, are purely matters of law: for instance, the issuing of a commission without a previous "*interlocutory decree*," under the act of 1820, *ch.* 161; the direction of it to only *one* commissioner, under the act of 1799, *ch.* 79; the mode of executing the commission under either act—involving the irregularities in the mode of swearing or affirming the witnesses, the want of their signatures to their depositions; and above all, the omission of *notice* of the time and place of opening and executing the commission. Not one of these irregularities come at all under the description of errors of fact, or rest at all upon the sufficiency of *proof.* The only point of evidence at all connected with them is the *admissibility* of the evidence, not the deductions of fact

from it; and its admissibility turns entirely upon the regularity and legality of the proceeding by which it is introduced, and presents a pure question of law.

4. The terms *"interlocutory decree,"* used in the *first* and *second sections* of the act of 1820, *ch.* 161, are construed by the counsel of the appellants to mean a mere interlocutory *order* for a *commission.* Now this interpretation is wholly inconsistent, both with the terms, *per se,* and with the context of the act. *Ex vi termini,* a *decree* is very different from a mere *order.* When the term *order* is applied to any proceeding which decrees any relief under the bill, it is qualified as a *decretal* order, to distinguish it from mere interlocutory orders in general. A *decree* in a cause, *ex vi termini,* imports either a decree for relief, or a dismission of the bill. An *"interlocutory decree"* means precisely the same thing; except that it is not, in the first instance absolute, but depends on a future contingency to make it so; and is often called a decree *nisi.* The " interlocutory decree," here spoken of, clearly means a decree for relief to be made absolute, or to be vacated on a future contingency—such as the appearance and answer, or the continued default of the defendant. In the mean time the commission issues; and by that means the complainant is enabled to proceed with the preparation of his cause for a final hearing, in case the decree should be vacated and issue joined. In entering this interlocutory decree for relief, the act of 1820, *ch.* 161, dispenses with the usual preliminary of such decrees—the taking the bill *pro confesso,* which can be done only on the terms prescribed by the *second section.* The sort of decree here intended is precisely that usually passed by a court of equity, upon a bill taken *pro confesso; i. e.* a decree *nisi.* This is still more clear from the *context;* for in the *first section* the commission is made a progressive and superadded step to the "interlocutory decree;" both the one and the other are to be done. It would be strange if they were one and identical. In the *second section* this same "interlocutory decree" is still insisted on as the preliminary to the order for taking the bill *pro confesso.* It would be still more strange if this last order, intended for the express purpose of *dispensing* with a com-

mission, and all extraneous evidence whatever, is, nevertheless, to be preceded and accompanied by the very thing dispensed with ! The argument of the counsel of the appellants, to show that they had an election to proceed under either act of Assembly—that of 1799, *ch.* 79, or 1820, *ch.* 161; the one being supposed to apply to cases where the defendant had stood out to an *attachment,* and the other to cases where the process had gone no further than a summons, and, therefore, that the two laws are consistent, and each operates upon its appropriate cases, is deemed to be clearly untenable. 1. If the two acts could be thus construed distributively as applicable to these two descriptions of cases, each must operate *exclusively* upon the cases respectively appropriated to it. The provisions applicable to the case of a mere *summons* could not be applied to and confounded with a case where the party stood out process of contempt. The court is not authorised to follow up these proceedings indiscriminately, in all cases of default, but is expressly authorized and *required* to apply the requisite proceeding to the given case. Therefore there cannot be, under any construction of these acts of Assembly, an *election* to pursue the one or the other course—the precise course being prescribed and limited to the specific case. 2. But, the two acts of Assembly cannot stand together; the latter act virtually supersedes and abrogates the former. It is true it speaks only of cases where the defendant has failed to appear or answer after *summons.* The only effect of this is to dispense with the process of *contempt* made a necessary preliminary by the former act of the order for taking the bill *pro confesso,* or for a commission. But no process of contempt can issue but upon a previous default to appear or answer upon summons—it is necessarily founded on a previous summons. Then when the last act comprehends *all* cases, as it expressly does, of *summons,* it necessarily comprehends all cases of *attachment*—the last, by no possibility, being supposed to exist without the other; and then the proceeding to an "interlocutory decree" and commission is not discretionary, but is required of the court, and becomes an imperative duty, upon the application of the complainant. This is made still more clear by the *second*

*section* of the act of 1820, *ch.* 161. By that, the terms on which a bill may be taken *pro confesso*, are strictly guarded and limited: Whereas, by the act of 1799, *ch.* 79, the order for taking the bill *pro confesso* is left entirely to the discretion of the court, upon the mere default of the defendant. 3. But if the validity of this argument were fully granted, the pretended right of *election* could avail nothing, since it is perfectly clear that the appellants have pursued neither act, but their proceedings consists of an incongruous medley of both. It is submitted by the appellee, whether the matter of this appeal be at all cognizable by this court. It is an appeal from a merely interlocutory order, which goes no further than to set aside a decree by *default*—leaving the whole merits open to a decision at the final hearing. Nothing is decided between the parties; but every possible claim, that could be asserted by the complainants under their bill, is fully reserved to them; and even *secured* to them by collateral *security*. They can lose nothing but by a failure of *merits* in their claim. This is, moreover, an interlocutory proceeding in a matter wholly under the *discretion* of the Chancellor. It is, therefore, insisted that this appeal be dismissed, as well upon general principles, as upon the authority of the cases in *Jackson vs. The Union Bank of Maryland*, 6 *Harr. and Johns.* 151 (*note.*) *Gover, et al. Lessee vs. Cooley*, 1 *Harr. and Gill*, 7. *Snowden vs. Dorsey*, 6 *Harr. and Johns.* 114. The principles upon which the case of *Thompson vs. M'Kim*, 6 *Harr. and Johns.* 302, is to be distinguished, are too recent and familiar to this court, to require any illustration or remark.

*Magruder* for the appellants, in reply to the last argument of the counsel of the appellee. The real difficulty in this case, is to ascertain to which class of bills, that with which we have to deal, does belong. It cannot be as it has some times been called a cross bill, because that *ex vi terminorum* implies a bill brought by a defendant in a suit against a plaintiff respecting the matter *in question* in that bill; and it is a weapon of defence in such case. *Cooper's Plead.* 85. It cannot be sustained as a bill to impeach a decree for fraud, in obtaining it. Here no fraud is admitted or attempted to be proved, "and the fraud

used in obtaining the decree, being the principal point in issue, and necessary to be established by proof before the propriety of the decree can be investigated." *Cooper's Plead.* 97. In reality it attempts to partake of every description of bill, and is a *non descript.* In the argument of the appellee's counsel, it is evidently designed to treat it as a bill of review, or in the nature of a bill of review. These two description of bills agree in all respects, (and also a supplemental bill in the nature of a bill of review, which in some places perhaps this bill is called,) except that the one is the proper bill to be filed *before,* and the other after the decree is enrolled. *Cooper's Plead.* 88, 89. One of the ordinances relative to bills of this description is that "the decree must be first obeyed and performed—if it be for money, the money must be paid," &c. *Cooper's Plead.* 91; "and where a sum of money is ordered to be paid, it is dispensed with, only if it appear that the party was unable to pay it." "And nothing will excuse the party from this duty but evidence of his inability to pay it." *Wiser vs. Blackly,* 2 *Johns. ch. Rep.* 491. "Where the party *is in execution under the decree,* and unable to pay, I should rather conclude that the non payment of the money, is not an insuperable obstacle." Per *Kent,* Chancellor, in *Livingston vs. Hubbs,* 3 *Johns. Ch. Rep.* 128. Such has been the fixed and invariable law, relative to the filing of bills of this description, from the time that bills of review were allowed. It is said there is no "such positive rule of law." As well might it be said, that there is no positive rule of law authorising the Chancellor to allow bills of review to be filed, and therefore they ought not to be allowed. It depends upon the discretion of the Chancellor. *Unde derivatur,* that notion? Is it reasonable? The propriety of calling upon an inferior court to review its own decree, and especially upon the ground of error in law, apparent upon the face of the decree, might well be questioned, unless the performance of it, where money is required to be paid, was insisted upon—the evils arising from its exercise—the delays which it would occasion, would be insufferable. In every case, where a considerable amount of money is directed to be paid, and it was the wish of the defendant, as long as posible to delay

the payment of it, instead of taking the appeal which he is by law authorised to take to this court. He could first file his bill of review, and only when that is disposed of, and he was not permitted to file a second, that he would carry his case into the court of last resort, in order to another review. Such bills surely ought not to be encouraged, and the rules which have been adopted to prevent the filing of them merely for delay and vexation ought not to be relaxed. If the plaintiff in a bill of review succeeds in obtaining a reversal of the original decree, a bill may be brought to review the reversal of the former decree, and praying that the original decree may stand. *Cooper's Plead.* 95. If upon a bill of review a decree has been reversed, another bill of review may be brought upon the decree of reversal. *Ib.* 92. And a bill of review has been permitted (upon new matter discovered) even after the affirmance of the decree in parliament. *Ib.* 92. There is and ought to be no such "latitude" allowed to the Chancellor "in adapting the terms to the circumstances of each case;" and the cases referred to of *Jackson vs. Union Bank of Maryland*, 6 *Harr. and Johns.* 151 (*note,*) and *Gover, et al. Lessee vs. Cooley*, 1 *Harr. and Gill*, 7, are not at all applicable to this.

This case is by no means entitled to be excepted from the operation of the rule. *Scott* knew the situation of the property when he administered. He has been a witness in this case between *Jane Burch* and *Gittings*, and an important witness, as appears by the exhibits. If because the property was in the possession of *Gittings* at the time of his death, he thought it right to include it in the inventory, he ought to have known, that it was not responsible for *Gittings's* debts, and no doubt took care to save himself harmless. It appears, moreover, in the testimony, that when the injunction was served upon him he declared he should hold (as he was authorised by law to hold) a sufficient amount of the proceeds of sale to meet this claim. Some of the money for which negroes sold, he says is uncollected, and if this be true, whose fault is it? The sale was made in October, 1818, on a credit of nine or twelve months. But what excuse can be made for filing this (misnamed) bill of review, when if the plain-

tiff wished to have justice done him, and the estate settled, an *appeal* to this court would have enabled him to have had the whole matter, not only the law of the case, but whether there was proof to warrant the decree, examined. The decree bears date the 4th of August, 1825, and the bill is filed the 15th of November, 1825—less than four months afterwards. It will be no answer to say that if the money had been paid over, and then the decree reversed, it would have been difficult to get it back. If so the course was to have brought the money into the Court of Chancery, and prays the Chancellor to detain it, pending the appeal, which could have been done, if there were reasonable appprehensions of its being lost. The plaintiff is evidently entitled to no favour. His object is and can only be delay, and to keep the money in his hand as long as it is possible. What is said about the policy of permitting bills of review to be filed after the expiration of the time allowed for appeals, we pass over; for if correct, it does not apply to this case—an appeal might have been prayed.

A few words will dispose of what is said under the *third* objection, as to the manifest errors of *law.* There is nothing in these erros. The decree is warranted either by the act of 1799, *ch.* 79 or 1820, *ch.* 161. The law to which the appellee's counsel refers, (1799, *ch.* 79, *sec.* 6,) authorises a commission for any purpose whatever to issue to *one* person only, or to three persons, with power to any two with the consent of the party or parties in court. There is an end then to the objection to these proceedings under the act of 1799; and there is as little objection to their regularity if it depended altogether on the act of 1820, *ch.* 161. By that act if the defendant fails to appear, upon being summoned, as is the case here, the *Chancellor, on* application of the complainant, is expressly authorised to issue a commission in order to get the proof necessary to entitle the complainant to relief; and this he did. But he must pass an interlocutory decree. And what is an interlocutory decree in such a case, but that a commission be issued? Is there any *formula* prescribed, and to be strictly observed? Must he at the top, or on the back of that order write "interlocutory de-

cree?" If this order be not a compliance with the law, it is difficult to imagine what is. It need not be said it is *decreed.* The design of the act of 1820, is to put it out of the power of the defendant by refusing to appear or to answer when he ought, to delay the complainant, if the latter be willing to dispense with the admissions which the answer of the defendant might make. The remedy is given only when the defendant is *in default,* and the subsequent clause of the act (1820, *ch.* 161, *sec.* 3,) affords to the defendant every benefit that he could desire. There is nothing in this objection; and need it be said, as little in the objection, the want of the witnesses' signatures to the depositions, nor as to the mode of executing the commissions, (both of which happened to be executed in the very best, and most regular mode,) nor "*above all,* the omission of the *notice* of the time and place of opening and executing the commission." Notice is never to be given *out of court* to a party who will not appear in court. If there had been any irregularity in executing the commission, the defendant ought to (as he might have) appeared in court and filed his exceptions. Objections of this description are not allowed at the hearing. If these objections could be sustained they would be nothing worth on this *bill of review;* they might deprive the complainants of some testimony, without which, perhaps, they could not have obtained a decree below; but it cannot be made a question now, whether if such and such depositions were out of the case, the remainder of the testimony would entitle the complainants to a decree. "A bill of review lies for manifest errors of law, not of *fact.*" *Non constat,* that the Chancellor grounded his decree on any of the exceptionable testimony. He too might have thought that there were some irregularities in execution of one, or the other commission.

What is said *under* the *fourth* objection, and especially in regard to the distinction between a *decree* in a *cause,* and an interlocutory decree, and decrees *nisi,* &c. need not be remarked on. The act of 1820 manifestly forbids any thing like a decree *nisi;* "a decree for relief to be made absolute, or to be vacated on a future contingency."

Nor need it be examined what is designed to prove that the latter act "supersedes and abrogates the former." Much of this, it is presumed, would have been omitted if it had been known that under the act of 1799, as well as of 1820, a commission may be issued to one person. The proceedings were warranted by either of the laws, so that either will be sufficient for the complainants; and it is because this case was in a situation which authorised them to proceed under either law, and the proceedings under both, (except the bill be taken *pro confesso,* under the act of 1799,) are precisely the same, that the learned counsel on the other side, supposes that "their proceeding consists of an incongruous medley of both."

As to what is said by the learned counsel—whether or not this appeal will lie? It need only be answered that it is to be taken for granted that the appeal will lie, until this court reverse (without mentioning others) their decisions in *Munnikuyson vs. Dorsett, 2 Harr. and Gill, 374,* and *the State, use of Sadler's Ex'r vs. Cox, Ib.* 379. Surely if from such an *order* by a court of common law an appeal will lie, it will, from an order in Chancery; and surely too every thing which is said now, might have been said, and was said, in the cases here referred to. If this be an interlocutory order, then the order of the court in the cases mentioned was an interlocutory judgment at law, from which, it is well settled, that no appeal will lie. Again, we are now called upon to deal with this as a bill of review, or bill in the nature of a bill of review, filed to ascertain if there be *error of law,* apparent in the body of the original decree. Now whoever heard, in such a case, of such a decree, as the decree under examination? In such a case the only decree which the Chancellor can pass is, that the original bill be dismissed, or else *modified,* and thereby remove the errors of law appearing in the body of the decree. To let in answers—to try the merits of the original suit upon other and new testimony is entirely out of the question, when the bill is a bill of review for errors of *law,* appearing on the face of the decree, and which *ex vi termini* forbids a re-examination of the facts of the decree; even the inquiry whether the original decree is warranted by the testimony

already in the case. Such suggestions as are to be found at the close of the argument of the counsel of the appellee, can never belong to a case of this description, and must surely have been made under an impression that this bill of review, though in its commencement for errors of *law*, is in the conclusion a bill "brought *upon discovery of new matter*, that is to come to light after the decree was made." Which certainly it has never been pretended that it was, and even then a new answer is a thing unheard of.

The learned counsel has considered this case throughout as a decree *by default*—an absolute decree grounded (if it had any grounds) upon what he calls an interlocutory decree *nisi*, and he has been misled by what he has read in the *English* chancery books (and perhaps *New-York* also) of the law and practice there prevailing with respect to opening decrees of that description. No such practice exists in our Court of Chancery, and in truth the power of the Court of Chancery here or in *England* to open its decrees because of error or irregularity in obtaining them, is not greater than the power of the courts of law. The power is recognized to exist in our Courts of Equity by the act of 1787, *ch.* 9, *sec.* 6. And this act shows that the court below had the same power to set aside its judgments in the cases before referred to, of *Munnikuyson vs. Dorsett*, and *the State use of Sadlers Ex'r vs. Cox*, that it can be pretended the Court of Chancery had to meddle with its decree in this cause. That there existed stronger grounds for interference in those cases than in this case, cannot possibly be denied. In our Court of Chancery a cause is never disposed of when under rule hearing, because of the default of either party in not appearing to argue it. It is very different in *England*, as will at once be seen by reference to their books of practice;—an example is given in *Cooper's Plead.* 269, (*note*)—a decree made upon the default of the defendant *in not appearing at the hearing*. A decree given for the plaintiff, because of the non appearance of the defendant to open and insist upon his defence, is a thing of constant occurence in the *English* Court of Chancery, (and similar practices prevail in their law courts;) but their being no such practice in our

Court of Chancery, decrees of that description and proceedings in relation to decrees of that description, which so frequently occur in *England*, can be of no service in this State but to furnish *material* for a speech in a desperate case. In *England* the rules of court which authorise such a decree, direct it first to be made *nisi*, and can only be made absolute on the defendant failing to show cause why it should not be, after being served with a writ of *supœna* for the purpose. *Cooper's Plead.* 269, 27. If there be any irregularity in these proceedings; if the decree has been made absolute, when in truth the *subpœna* was not served, a decree founded on the rules of court and subject to those rules, will be open, when it appears to have been taken in violation of those rules. It is the same in the courts of law. There is a rule somewhat like this in this court, and the construction given to that rule ought to have been conclusive with the Chancellor, and should have influenced him to dismiss this bill, and *to have revoked his order which suspended all proceedings under the original decree.* The rule alluded to, is that which entitles the appellee to an affirmance of his judgment *nisi*, if the appellant and his counsel are absent when the court reaches the case, and to an *absolute* affirmance if within a certain number of days thereafter, notes are not filed on the side of the appellant. Now suppose this case had been in this court, and had been affirmed under that rule, would all the reasons and excuses suggested in this bill have induced the court to *open* the affirmance, *at a succeeding term?* If one term or more after a judgment is affirmed under this rule, the appellant was to apply for an order to open the decree, in order to try the merits, and because the appellee can "lose nothing but by a failure of merits in his claim;" and he was by affidavit to make known to the court that he had employed a counsellor, and if you please, one who was not a regular practitioner of the court, and could not neglect other courts and other business to attend a court in which he did not regularly practice, once had really thought his counsellor did go to court, and would be there when the cause was regularly called up and never knew to the contrary, till the appeal was affirmed. It is apprehended, that precisely

that same answer which this court would give to such an application, is the one which the Chancellor ought to have given to *Scott;* and for not giving it, there is error in his decreee, and in his suspending proceedings under the former decree, which it is the duty of this court to correct. *Scott's* case is infinitely worse. He apologizes for not having filed an answer—it was lost. But he makes no sort of apology for that of which we complain, and which caused so much delay in the court below,—his contempt in *not appearing* to the suit, or giving any attention to the case from September term, 1823, when he was bound to appear, until November, 1825, when for the first time he came into court, to stay the proceedings.

STEPHEN, J. delivered the opinion of the Court.

Considerable difficulty has been felt in coming to a decision in this case, which involves principles of practice not of very frequent occurrence, and which affect in a high degree, the regular and ordinary administration of equitable jurisprudence. It appears by the proceedings in the court below, and which have been brought up here on appeal, that a controversy exists as to the right of property in certain negroes, or the proceeds for which they have been sold, between the representatives of *Jesse Burch,* and those of a certain *Kinsey Gittings.* To recover these proceeds and to have a distribution made among them, the representatives of *Burch* filed their bill of complaint in the Court of Chancery, on the 14th day of July, 1823, against *William Scott,* one of the appellees, as the administrator of said *Gittings,* in which bill they also pray for an injunction, to prevent *Scott* from paying over, or in any manner parting with the proceeds of sale until the final decree of the court.

The Judge here referred to the proceedings in the Court of Chancery before set forth, including the decree of the Chancellor, and then continued.

Upon the propriety of this discision this court are now called upon to decide. As a bill of review to reverse the decree of the Chancellor, for error apparent on the face of the decree, it cannot be available for the complainants. The error which

will reverse a decree upon such a bill must appear in the body of the decree itself. *Wyatt* in his Practical Register, page 94, states that a bill of review is to examine and reverse a former decree upon error of law appearing in the body of the decree itself, without averment or further examination of any matter of fact before the decree, or of any matter resting upon record, which might have been had at the time of the decree—so in page 98 of the same book, he states the principle to be that upon a bill of review, the party cannot assign for error, that any of the matters decreed, are contrary to the proofs in the cause; but must shew some error appearing in the body of the decree, or new matter discovered since the decree made. So in *Catterall vs. Purchase*, 1 *Atkyn's Rep.* 290, the Lord Chancellor observed it is true on arguing a demurrer to a bill of review nothing can be read but what appears on the face of the decree, but after the demurrer is over ruled, the plaintiffs are at liberty to read bill or answer, or any other evidence, as at a rehearing, the cause being now equally open. To the same effect see *Cooper's Pleadings in Equity*, page 89, *Mitford*, page 178. *Taylor vs. Sharp*, 3 *Peere Williams*, 371—If a decree be obtained and enrolled, so that the cause cannot be reheard upon a petition, there is no remedy but by bill of review, which must be upon error appearing upon the face of the decree, or upon some new matter, as a release, or a receipt discovered since—*Wyatt. P. R.* page 98. When a bill of review is brought for error apparent, according to the English practice, the usual method is for the defendant, to put in a plea, and demurrer; a plea of the decree, and a demurrer against opening the enrollment; so that in effect a bill of review cannot be brought without having the leave of the court in some shape; for if it be for matter appearing in the body of the decree, then upon the plea and demurrer of the defendant to the bill the court judges whether there are any grounds for opening the enrollment; if it be for matter come to the plaintiffs knowledge after pronouncing the decree, then upon a petition for leave to bring a bill of review, the court will judge if there be any foundation for such leave, *Wyatts P. R.* page 99. The defendant generally puts in the

usual demurrer, that there is no error in the decree. He rarely or ever answers unless ordered thereto by the court, and the demurrer being set down to be argued, the court proceeds to affirm or reverse the decree, and the prevailing party takes the deposite, (*a*) same book, same page. In the case now before this court, the defendants have thought fit to desert the usual course of proceedings, according to the above practice, and have put in their answer instead of demurring. But upon a bill of review for error apparent no distinction has been discovered, between an answer, and a demurrer, because in both cases the court will judge whether there be error in the body of the decree. Upon examining the decree in this case, it does not appear to this court, that there is any error in law apparent upon its face, nor can the bill be supported upon the ground of new matter discovered since the decree, because such new matter must be to prove what was before in issue, and the leave of the court must be obtained before a bill of review can be filed on this ground, and which the court will not grant, without an affidavit that the new matter could not be produced or used by the party claiming the benefit of it at the time, when the decree was made. No such new proof is alleged in this case to have been discovered since the decree was made. *Cooper's Plead. in Equity, page* 91. A supplemental bill in the nature of a bill of review, for want of proper parties will not be available, after a decree has been signed and enrolled. *See Wiser vs. Blachly,* 2 *Johnson N. Y. C. Rep.* 488. *Cooper's Equity Plead. page* 94, where a decree is impeached on the ground of fraud practised in obtaining it, the fraud must be established by proof, before the propriety of the decree can be investigated, same book, page 97. There is nothing in this case by which it can be sustained upon the ground of new matter discovered since the decree, for such new matter as already remarked, must be something tending to prove what was in issue between the parties. *Cooper's Equity Plead. page* 91, and where either a bill of review

(*a*) A sum formerly deposited in court as a security, to satisfy costs and damages for delay, if the matter should be found against the party who preferred *such bill.* *Wyatt's P. R.* 51, *ed. of* 1714.

after enrollment, or a supplemental bill in the nature of a bill of review before enrollment are brought upon the ground of such discoveries, *the leave of the court must be obtained*, which the court will not grant without affidavit that the new matter could not be produced or used by the party claiming the benefit of it, at the time when the decree was made. *Cooper's E. P.* pages 91, 92, 93, 94. *Wyatt's Chancery*, 98, 99. As to the question, when a decree of the Court of Chancery of this State is to be considered and taken as enrolled, we consider it to be clothed with that solemnity, when it is signed by the Chancellor, and filed by the register, and the term has elapsed during which it was made. The only question which remains to be considered is, whether it is consistent with the salutary and wholesome exercise of that sound discretion, which it is admitted the court possesses upon subjects of this nature, to open or discharge the enrollment and vacate the decree, in this case for the purpose of enabling the defendant to make his defence. Upon full and mature deliberation, we are of opinion that it is not. We consider that the establishment of such a lax principle of practice would be productive of the most deleterious consequences, in the administration of equitable jurisprudence, by the tribunals clothed with Chancery powers in this State. After being repeatedly in contempt by disregarding the solemn process of the court, the complainant makes his present application rather with an ill grace. *In Wooster vs. Woodhull,* 1 *Johnson N. Y. C. R.* page 541, the Chancellor says, "the interference of the court to relieve a party from the consequences of his default must depend upon sound discretion, arising out of the circumstances of the case. There is no general and positive rule on the subject; and Lord Thurlow observed in one case, (*Williams vs. Thompson,* 2d *Bro.* 279,) that if a defendant comes in after a bill has been taken *pro confesso*, upon any reasonable ground of indulgence and pays cost, this court will attend to his application, if the delay has not been extravagantly long. If the indulgence be great and frequent, there is danger of abuse of the precedent, for the purposes of delay. According to the opinion of Lord Hardwicke as stated in this case, the ques-

tion in such cases is, on which side the greatest inconvenience would lie? Testing the propriety of granting the present application by that principle, and but little doubt can exist as to the fate which ought to await it. On the one hand if granted, the complainant might gain an advantage which he has lost by his own repeated contumacy and gross negligence; on the other hand instead of a regular and speedy administration of justice by a prompt and respectful attention to the process and jurisdiction of the court, they will be disregarded and disobeyed, whenever a respondent could thereby gain an advantage, to the great reproach of the law, and the most serious delay in the judicial dispensations of justice. On these grounds it is conceived, that the Chancellor erred.

DECREE REVERSED.

